IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATIE NEIDIGH, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 14-576 |
| | ) | |
| v. | ) | |
| | ) | |
| SELECT SPECIALTY HOSPITAL - MCKEESPORT, | ) | Judge Cathy Bissoon |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM ORDER

For the reasons that follow, the Motion for Summary Judgment (Doc. 22) filed by Select Specialty Hospital - McKeesport ("Defendant") will be GRANTED.

## I. MEMORANDUM

Pending before the Court is Defendant's Motion for Summary Judgment. Defendant seeks judgment as a matter of law with respect to all claims asserted in the Second Amended Complaint (Doc. 18 ("the Complaint" or "Compl.")) filed by Katie Neidigh ("Plaintiff") on September 29, 2014. Plaintiff claims that she was terminated due to her pregnancy in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951 *et seq.* ("PHRA").[1] For the reasons that follow, Defendant's motion will be granted.

---

[1] At Count IV of her Second Amended Complaint, Plaintiff also raises a claim pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). (Compl. at 7 – 8). Plaintiff subsequently abandons this claim in her Brief in Opposition to Defendant's Motion for Summary Judgment. (Doc. 26 at 1 n. 1). As such, the Court will dismiss the claim at Count IV.

**BACKGROUND**

Plaintiff began working for Defendant as a Registered Respiratory Therapist beginning on March 6, 2006, and remained in that position until her termination on April 18, 2013. (Docs. 24 at ¶ 3; 27 at ¶ 1; 28 at ¶ 3; 34 at ¶ 1). Plaintiff had a known, pre-existing spinal injury, but was nevertheless capable of performing the essential duties of her position during her term of employment. (Docs. 27 at ¶¶ 2–4, 6, 8; 34 at ¶¶ 2–4, 6, 8). Unfortunately, Plaintiff was informed by her treating physicians that a future pregnancy could significantly exacerbate her spinal injury. (Docs. 27 at ¶ 5; 34 at ¶ 5). On or about February 22, 2013, Plaintiff learned that she was pregnant. (Docs. 24 at ¶ 29; 27 at ¶ 9; 28 at ¶ 29; 34 at ¶ 9). Plaintiff subsequently informed her immediate supervisor, Kristie Koklarinis, the Chief Nursing Officer, Sue Pleins, and the Human Resources Coordinator, Julia Schultz, of the pregnancy. (Docs. 24 at ¶ 9; 27 at ¶ 10; 28 at ¶ 9; 34 at ¶ 10). Having previously been made aware of Plaintiff's spinal injury and the complications that could arise should she become pregnant, Ms. Koklarinis expressed concern about Plaintiff's ability to continue working. (Docs. 27 at ¶ 7; 34 at ¶ 7). Plaintiff and Ms. Schultz thereafter met to discuss the availability of FMLA leave and details pertinent to taking said leave. (Docs. 24 at ¶¶ 30–32; 27 at ¶¶ 11–12; 28 at ¶¶ 30–32; 34 at ¶¶ 11–12).

On April 13, 2013, Plaintiff sought medical attention for back pain at a local MedExpress following a twelve-hour work shift. (Docs. 27 at ¶ 19; 34 at ¶ 19). Plaintiff, thereafter, alerted Defendant that she would be absent from work for medical reasons on April 14, 2013. (Docs. 24 at ¶ 39; 27 at ¶¶ 22 – 23; 28 at ¶ 39; 34 at ¶¶ 22–23). Ms. Koklarinis filled in for Plaintiff that day because no other respiratory therapists were available. (Docs. 24 at ¶ 39; 27 at ¶ 26; 28 at ¶ 39; 34 at ¶ 26). While Ms. Koklarinis was covering Plaintiff's shift, Plaintiff called into work and spoke with fellow respiratory therapist, Timothy Hayes. (Docs. 27 at ¶ 27; 34 at ¶ 27).

Plaintiff asked Mr. Hayes if Ms. Koklarinis was upset about taking Plaintiff's shift, to which Mr. Hayes replied that Ms. Koklarinis was "furious." (Docs. 25-8 at 4–7; 27 at ¶ 27; 34 at ¶ 27). Ms. Koklarinis admits that she told Mr. Hayes to tell Plaintiff that she was "furious," although she states that she was, not furious, but rather "exasperated" about covering Plaintiff's shift. (Doc. 25-6 at 10-11).

While completing Plaintiff's shift, Ms. Koklarinis cared for the husband of a woman referred to as "Mrs. M." (Docs. 27 at ¶ 31; 34 at ¶ 31). Plaintiff was one of Mr. M's regular caregivers, and Mrs. M inquired of Ms. Koklarinis as to Plaintiff's whereabouts. (Docs. 27 at ¶¶ 31–32; 34 at ¶¶ 31–32). When informed that Plaintiff was not able to work that day for medical reasons, Mrs. M indicated that she recently learned that Plaintiff was pregnant, which "explains a lot." (Docs. 27 at ¶ 31; 34 at ¶ 31). Ms. Koklarinis asked Mrs. M to explain what she meant. (Docs. 27 at ¶ 32; 34 at ¶ 32). Mrs. M went on to state that Plaintiff had confronted her and her granddaughter during a visit on Easter Sunday because they had failed to wear appropriate isolation gear into Mr. M's room. (Docs. 24 at ¶ 45; 27 at ¶¶ 31–32; 28 at ¶ 45; 34 at ¶¶ 31–32). Mrs. M stated that Plaintiff yelled at her and wagged her finger in her granddaughter's face. (Docs. 24 at ¶ 46; 27 at ¶¶ 31–32; 28 at ¶ 46; 34 at ¶¶ 31–32). Mrs. M claimed that she felt embarrassed by what she considered to be rude and unprofessional treatment, but had not come forward earlier because she did not wish to see Plaintiff disciplined. (Docs. 24 at ¶ 47; 27 at ¶ 37; 28 at ¶ 47; 34 at ¶ 37). Ms. Koklarinis took no further action that day with respect to Mrs. M's statement.

The following day, Plaintiff attempted to contact Ms. Shultz to inform her that she was seeking treatment for a back condition and that she would be absent for her next scheduled shift on April 17, 2013. (Docs. 27 at ¶¶ 38–41; 34 at ¶¶ 38 – 41). However, Plaintiff was not able to

3

speak with Ms. Schultz until the following day, April 16, 2013, at which point Plaintiff submitted physicians' notes for her absence on April 14, 2013, and her impending absence on April 17, 2013. (Docs. 24 at ¶¶ 40–41; 27 at ¶¶ 22–23, 42; 28 at ¶¶ 40–41; 34 at ¶¶ 22–23, 42). The April 14 note did not specify a reason for Plaintiff's absence. (Docs. 27 at ¶¶ 22–23; 34 at ¶¶ 22–23). The April 17 note cited treatment for "lumbar strain." (Docs. 24 at ¶ 75; 28 at ¶ 75).

On April 16, 2013, Ms. Koklarinis informed Ms. Pleins about Plaintiff's behavior towards Mrs. M. (Docs. 24 at ¶ 50; 27 at ¶¶ 46, 57; 28 at ¶ 50; 34 at ¶¶ 46, 57). Ms. Pleins then spoke with Mrs. M, and relayed Mrs. M's statements to Ms. Schultz and Daniel Butts, the Chief Executive Officer. (Docs. 24 at ¶ 55; 27 at ¶¶ 58–63; 28 at ¶ 55; 34 ¶¶ 59–63). Ms. Pleins then emailed a summary of her interaction with Mrs. M to the above individuals; this email mirrored the complaints originally made to Ms. Koklarinis, but with the addition of claims that Plaintiff had also been giving Mrs. M "dirty looks." (Docs. 24 at ¶ 61; 27 at ¶ 64; 28 at ¶ 64; 34 at ¶ 64).

Mr. Butts subsequently interviewed Mrs. M, and then discussed the issue with Ms. Shultz, Ms. Pleins and Barbara Foster, the Regional Human Resources Director. (Docs. 24 at ¶¶ 56–57, 66; 27 at ¶¶ 74–78, 99; 28 at ¶¶ 56–57, 66; 34 at ¶¶ 74–78, 99). Plaintiff's personnel file was examined in conjunction with Mrs. M's complaint, and it was noted by the parties that Plaintiff had been issued several warnings for inappropriate workplace conduct, including a "final written warning" in September 2012 for reprimanding a co-worker. (Docs. 27 at ¶¶ 81, 88; 34 at ¶¶ 81, 88). Ms. Shultz also alerted Ms. Foster that "[j]ust an FYI, I know that you would need to be aware that Katie is also very recently pregnant." (Docs. 27 at ¶ 100; 34 at ¶ 100). The discussions between Ms. Schultz, Ms. Pleins, Mr. Butts and Ms. Foster ultimately resulted in Mr. Butts and Ms. Foster concluding that Plaintiff's employment should be terminated. (Docs. 24 at ¶ 74; 27 at ¶¶ 103–113; 28 at ¶ 74; 34 at ¶¶ 103–113).

Consequently, Ms. Schultz contacted Plaintiff and asked her to report to work on April 18, 2013, although she had not been scheduled for that day. (Docs. 24 at ¶ 76; 27 at ¶ 114; 28 at ¶ 76; 34 at ¶ 114). Upon arrival, Plaintiff entered a meeting with Ms. Schultz, Mr. Butts and Ms. Koklarinis. (Docs. 24 at ¶ 76; 27 at ¶ 117; 28 at ¶ 76; 34 at ¶ 117). At that point, Plaintiff was informed that her employment was being terminated; she was not given the opportunity to present a defense or write a statement, and she refused to sign a disciplinary action form presented by Mr. Butts. (Docs. 24 at ¶ 76; 27 at ¶¶ 119–121; 28 at ¶ 76; 34 at ¶¶ 119–121). For two months following her termination, Plaintiff's position was filled by temporary, *per diem* respiratory therapists until Joe Masaitis – a current, full-time night shift employee – assumed Plaintiff's position on a permanent basis. (Docs. 27 at ¶ 124; 34 at ¶ 124).

Ms. Schultz is responsible for the administration of policy and procedure and advising on employee discipline. (Docs. 27 at ¶ 47; 34 at ¶ 47). Ms. Schultz testified that, in response to a patient or family member complaint, Select responds as follows: the information is written on a form; the form goes to quality management; an investigation begins and "quality" speaks to the family; the chief nursing officer speaks with the family; and the CEO is involved and might speak with the family. (Docs. 27 at ¶ 48; 34 at ¶ 48). Specifically, if a family member approaches a Select employee with a complaint, the employee is supposed to complete an "angry man" or "angry person" form, which details the complaint, and return said form to Ms. Pleins or the charge nurse. (Docs. 24 at ¶ 53; 28 at ¶ 53). Ms. Koklarinis did not complete an "angry person" form or otherwise document Mrs. M's complaint prior to speaking with Ms. Pleins. (Docs. 27 at ¶ 56; 34 at ¶ 56).

As stated *supra*, prior to the incident involving Mrs. M, Plaintiff had been issued several warnings for inappropriate workplace conduct, including a "final written warning" in September

2012 for reprimanding a co-worker. (Docs. 27 at ¶¶ 81, 88; 34 at ¶¶ 81, 88). In October, 2012, after Plaintiff's receipt of a final written warning, but prior to her pregnancy and the April, 2013, flare-up of her back injury, a patient, "Mrs. D," complained that Plaintiff abruptly removed a respiratory device from the patient without saying anything to her. (Docs. 24 at ¶ 26; 28 at ¶ 26). Ms. Pleins investigated the complaint by speaking with Mrs. D, and with another employee who was present during the alleged incident. (Docs. 27 at ¶ 92; 34 at ¶ 92). Mrs. D was known as a "difficult person," who had also been described as "confused." (Docs. 24 at ¶ 28; 28 at ¶ 28). Plaintiff was permitted to provide a written statement about the incident for Ms. Pleins's consideration during the investigation. (Docs. 27 at ¶ 93; 34 at ¶ 93). Plaintiff's statement was consistent with the statement of the witnessing employee, and ultimately no formal disciplinary action was taken. (Docs. 27 at ¶ 94; 34 at ¶ 94).

## ANALYSIS

In its Motion for Summary Judgment, Defendant first argues that Plaintiff has not established a *prima facie* case of pregnancy-based discrimination under Title VII because she cannot demonstrate that she received less favorable treatment than similarly situated employees who were not in her protected class.[2] (Doc. 23 at 9 – 13). In order to make a *prima facie* showing of pregnancy-related discrimination, Plaintiff must show: (1) that she was pregnant and

---

[2] Title VII is "construed consistently" with the PHRA; therefore, the Court need not discuss Plaintiff's PHRA claims separately from her Title VII claims. Weightman v. Bank of New York Mellon Corp., 772 F.Supp.2d 693, 701 n. 3 (W.D. Pa. 2011) (citing Gomez v. Allegheny Health Serv., Inc., 71 F.3d 1079, 1084 (3d Cir. 1995)). Moreover, the Court notes that Title VII, as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), "is breached 'whenever an employee's pregnancy [or related medical condition] is a motivating factor for the employer's adverse employment decision.'" Doe. v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 364 (3d Cir. 2008) (quoting In re: Carnegie Ctr. Assoc., 129 F.3d 290, 294 (3d Cir. 1997)). Where, as here, the claimant relies upon circumstantial evidence to demonstrate intent to discriminate, the Court adheres to the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Id.

6

her employer was aware of her pregnancy; (2) that she was qualified for her position; (3) that she suffered an adverse employment action; and (4) that there is a causal nexus between her pregnancy and the adverse employment action. Doe. v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 365 (3d Cir. 2008). While this burden differs somewhat from the requirements for a *prima facie* showing of gender-based discrimination, the burden is meant to be similarly easy to meet. Id. (citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). When viewed in the light most favorable to Plaintiff, the facts adduced in discovery satisfy the first three elements. Defendant challenges the fourth element.

The means by which a claimant most often satisfies the fourth element is by showing that she was treated less favorably than similarly situated employees who are not in the same protected class – in this case, non-pregnant persons. C.A.R.S. Protection Plus, Inc., 527 F.3d at 366 (citing Iadimarco v. Runyun, 190 F.3d 151, 162 (3d Cir. 1999)). As explained by Defendant in its motion, Plaintiff has not produced evidence to support such a showing. Indeed, Plaintiff's testimony that a pregnant co-worker by the name of Alecia had taken seven or eight weeks of maternity leave, but was not terminated, seems to contradict the assertion that Defendant treated pregnant employees less favorably than non-pregnant employees.[3] (Doc. 25-1 at 13).

Plaintiff instead relies upon: (1) evidence that Defendant hired a replacement outside of her protected class; (2) the temporal proximity between Plaintiff calling off from work for pregnancy-related medical issues and her termination; (3) the notation of Plaintiff's pregnancy by supervisors during discussion of Plaintiff's termination; and (4) evidence that Ms. Koklarinis initiated the investigation into Plaintiff's alleged workplace misconduct due to her anger over Plaintiff's use of leave for pregnancy-related medical issues. (Doc. 26 at 6–14). When viewed in

---

[3] Plaintiff also noted that an aide on her floor, whose name she could not recall, was frequently absent from work due to pregnancy, but was not terminated. (Doc. 25-1 at 14).

the light most favorable to Plaintiff, the Court finds this evidence sufficient to surmount the minimal evidentiary hurdle posed by the fourth element. C.A.R.S. Protection Plus, Inc., 527 F.3d at 368 – 69; Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 356–57 (3d Cir. 1999); McKenna v. City of Phila., 649 F.3d 171, 177–78 (3d Cir. 2011).

The above notwithstanding, Defendant argues that even if Plaintiff met her *prima facie* burden, Defendant has put forth significant evidence of a legitimate, nondiscriminatory basis for terminating Plaintiff's employment, *i.e.* a lengthy disciplinary history culminating in a final written warning warranting termination for additional work-place infractions. (Doc. 23 at 13–16). Submissions from Plaintiff's personnel file and deposition testimony indicate that she was reprimanded on four occasions in 2010 for conduct that violated workplace standards: once for improper patient care documentation; once for insubordination during a meeting; once for openly disparaging two co-workers by referring to them as "a bunch of stupid asses;" and once for wasting medical supplies in "horseplay" with other staff members. (Docs. 25-1 at 31; 25-14; 25-15; 25-16; 25-17). In 2011, Plaintiff received a written warning for three timekeeping discrepancies, and for failing to call-off of work until 45 minutes into her scheduled shift. (Docs. 25-1 at 32; 25-18). Lastly, on September 12, 2012, Plaintiff received a final written warning for strongly reprimanding a co-worker in front of patients, family-members and staff. (Docs. 25-1 at 33–35; 25-19). The warning specifically noted that "[a]ny further violation may result in termination." (Id.).

The Court notes that during discovery it also was revealed that on April 13, 2013, just prior to Plaintiff's termination, there was a heated exchange between Plaintiff and a supervising charge nurse by the name of Missy. (Doc. 25-1 at 22). While there was no official disciplinary action on record regarding the exchange, it was apparent that administrative officials were aware

8

of the exchange, and, in fact, Plaintiff believed that that she was being called into work on April 18, 2013, as a result of that incident. (Id.). The Court finds that this evidence, in conjunction with Mrs. M's complaint of Plaintiff's allegedly rude and unprofessional behavior towards her and her granddaughter, is adequate to constitute a legitimate, nondiscriminatory basis for Plaintiff's termination. (Docs. 25-21).

Plaintiff asserts that Defendant's explanations for her termination are mere pretext. In order to substantiate her assertion of pretext, Plaintiff must provide the Court with sufficient "'evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" Michaels v. BJ's Wholesale Club, Inc., 604 F.App'x 180, 182 (3d Cir. 2015) (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)). The evidence must allow a factfinder to infer that Defendant's nondiscriminatory basis for termination of Plaintiff "was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." Fuentes, 32 F.3d at 764. Moreover, Plaintiff must do more than demonstrate that Defendant's basis for her termination was incorrect or mistaken, "since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Id. at 765.

The Court begins with Plaintiff's argument that Ms. Koklarinis's report of Plaintiff's behavior towards Mrs. M was calculated to result in an adverse employment action that would relieve her of the need to find replacements if Plaintiff took time off of work for pregnancy-related issues. Under the "cat's paw" theory of liability, an employer may be liable for the discriminatory animus of a non-decisionmaking supervisor when such animus is the proximate

9

cause of an adverse employment action. McKenna, 349 F.3d at 177. A biased report designed by the supervisor to cause an adverse employment action may be considered a causal factor in a termination proceeding if an independent investigation conducted by the decisionmaking authority "'takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified.'" Id. at 178 (quoting Staub v. Proctor Hosp., 562 U.S. 411, 421 (2011)). Reliance by the decisionmaking authority upon facts provided by the biased supervisor when conducting its investigation is a requirement for establishing cat's paw liability. Staub, 562 U.S. at 421.

Plaintiff's evidence that Ms. Koklarinis frequently asked Plaintiff about whether she would be able to continue working when pregnant due to a pre-existing spinal injury, and Ms. Koklarinis's statement that she was "furious" when she had to fill in for Plaintiff due to pregnancy-related medical issues, could certainly allow a reasonable factfinder to infer discriminatory animus when Ms. Koklarinis reported Plaintiff's behavior towards Mrs. M. However, aside from relaying the subject matter of her conversation with Mrs. M to Mrs. Pleins, it is undisputed that Ms. Koklarinis had no part in the determination to terminate Plaintiff. (Docs. 23 at 12; 26 at 13). Ms. Pleins and Mr. Butts both conducted separate, independent interviews with Mrs. M. Not only did these interviews corroborate Ms. Koklarinis's report, but the interviews gleaned additional evidence that Plaintiff also had been giving Mrs. M "dirty looks." Whatever Ms. Koklarinis's motivation for reporting Plaintiff's behavior towards Mrs. M, independent interviews and review of Plaintiff's disciplinary record provided justification for Plaintiff's termination. The record demonstrates that the decision-makers did not rely upon the facts provided by Ms. Koklarinis. As such, there is no basis for cat's paw liability.

Plaintiff also looks to the temporal proximity of her absences for pregnancy-related medical issues and her eventual termination. While temporal proximity may be adequate, alone, to create an inference of discrimination, it must be "unusually suggestive" and not mere coincidence. Stites v. Alan Ritchey, Inc., 458 F.App'x 110, 112 (3d Cir. 2012). The record establishes that a complaint was made regarding Plaintiff's behavior while Plaintiff happened to be absent from the workplace. While Plaintiff has asserted that the process of terminating her employment indicated the existence of discriminatory animus, she has not provided evidence that Mrs. M's complaint, itself, or the fact that Ms. Koklarinis reported it and that her employer investigated it, could lead to an inference of such animus. Mrs. M's complaint, although the catalyst for the investigation, was no more than a coincidental occurrence while Plaintiff was away from work. As such, temporal proximity will not suffice to establish pretext.

Lastly, Plaintiff claims that Ms. Koklarinis, Ms. Pleins, Ms. Schultz and Mr. Butts failed to follow the proper procedure for investigating employee misconduct, evidencing discriminatory animus. During their depositions, Ms. Koklarinis, Ms. Pleins, Ms. Schultz, Mr. Butts and Ms. Foster discussed facets of Defendant's disciplinary process. (Docs. 21-2 at 4, 6, 9–10; 25-3 at 21–22, 28–29, 32–33; 25-4 at 8; 25-5 at 5–7, 9–10; 25-6 at 6–9, 14). To the extent Plaintiff rests her argument on procedural irregularities in investigating and documenting workplace violations prior to, and including, Plaintiff's final written warning, these all occurred well before Plaintiff announced her pregnancy on February 22, 2013, and therefore have no bearing on the present case. However, to the extent Plaintiff's supervisors engaged in distinct investigation processes prior to and after the announcement of Plaintiff's pregnancy, pretext may

11

be shown.[4]  "[T]he mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual." Maull v. Div. of State Police, 39 F.App'x 769, 774 (3d Cir. 2002) (quoting Randle v. City of Aurora, 69 F.3d 441, 454 (10th Cir. 1995)).  A claimant must show that this treatment was different for those within and outside the protected class.  Id.

Here, Plaintiff attempts to demonstrate that she, herself, was treated differently with respect to the Mrs. M incident – when she was pregnant – as compared with prior alleged infractions that occurred before her pregnancy.  The Court specifically compares Select's process utilized in October, 2012, in response to Mrs. D's complaint (which was issued prior to her pregnancy), to the process utilized in response to the complaint of Mrs. M, as both infractions occurred after Plaintiff received a final written warning.  While the two processes did differ, legitimate, non-discriminatory bases for implementing a different process exist.  In other words, it is not the case that the only material differences between Plaintiff's situation in April of 2013 and October of 2012 are her pregnancy and pregnancy-related medical issues.  Pregnancy aside, Plaintiff was not similarly situated in those two instances.

Plaintiff relies heavily on the fact that she was allowed to make a written statement of her version of events, and another co-worker also wrote a statement in support, in response to Mrs. D's complaint in October 2012, prior to her pregnancy.  (Docs. 27 at 91–94; 34 at 91–94).

---

[4] Plaintiff argues that Defendant deviated from its formal disciplinary process with respect to its investigation of Mrs. M's complaint.  However, she has failed to demonstrate that there is one single disciplinary process either in theory, via the Employee Handbook, or in practice.  The Employee Handbook makes clear that while there are certain recommended steps, all such steps are discretionary.  (See Doc. 25-9).  Plaintiff also has failed to allege that Defendant consistently engaged in a specific, distinct process with respect to other non-pregnant employees, or herself prior to pregnancy, from which they deviated in April of 2013.

12

According to Plaintiff, these written statements were crucial in determining that the patient complaint had no merit. Plaintiff argues that there is no indication that Select sought the statements of other staff members or herself during the investigation of Mrs. M's complaint. However, Plaintiff also fails to argue that any other staff person witnessed the incident between herself and Mrs. M. Without a witness, there is no one to question. Further, nowhere does Plaintiff argue that it is Select's official policy to take such a statement from the accused employee. Nor does she allege that Select engaged in a pattern of taking such statements, either from her or from other accused employees. It appears that Select opted to take Plaintiff's statement in October of 2012 for two unique reasons: 1) Mrs. D was a patient who was known to be both "difficult" and "confused"; and 2) there was a "tie" of sorts between Mrs. D's statement and the statement of the other employee witness, and it made investigatory sense to question Plaintiff in that context. Mrs. M was not known to be confused or difficult in any way – in fact she was the family member of a patient, not a patient herself – and her statement was not contradicted by the statement of any witness.

Plaintiff also argues that the April 2013 investigation differed in other ways. First, Ms. Koklarinis did not document Mrs. M's complaint using an "angry person" form. However, Plaintiff does not demonstrate that such a form was used to document Mrs. D's complaint either. Second, Ms. Pleins testified that Mr. Butts's involvement in the termination of Plaintiff was unprecedented. (Doc. 25-5 at 5, 7). However, Ms. Pleins also testified that involvement of the CEO is a potential part of the investigation process in response to a patient or family complaint. Perhaps due to the absence of a basis to question the credibility of Mrs. M, and in light of Plaintiff's final written warning, involvement of the CEO was deemed to be appropriate. Regardless, Plaintiff is required to show that this action was more than unnecessary or in error,

13

but was motivated by discriminatory animus. Fuentes, 32 F.3d at 765. Plaintiff fails to make that showing.

Further, Defendant has noted that the policy outlined in Select's employee handbook gives it full discretion to disregard any part of the disciplinary process when appropriate. (Doc. 25-9). It is not the case that Select declined to investigate Mrs. M's complaint, and instead chose to immediately effect an adverse employment decision. To the contrary, both Mrs. Schultz and Mr. Butts independently spoke with Mrs. M to hear her version of events. Defendant indeed engaged in an investigatory process in order to determine whether Plaintiff engaged in behavior that violated Defendant's "core values." The discrepancies in the disciplinary process before and after Plaintiff's pregnancy, even when viewed in the light most favorable to Plaintiff, are insufficient to allow a factfinder to reasonably disbelieve Defendant's articulated legitimate, nondiscriminatory basis for Plaintiff's termination.

Plaintiff also attempts to show pretext via Ms. Schultz's email informing Ms. Foster that Plaintiff was pregnant. It has been held that stray remarks can constitute evidence of the atmosphere in which an employment decision was carried out. Walden v. Georgia-Pacific Corp., 126 F.3d 506, 521 (3d Cir. 1997). Such a statement "'may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive.'" Id. (quoting Antol v. Perry, 82 F.3d 1291, 1302 (3d Cir. 1996)). Nevertheless, even viewed in the light most favorable to Plaintiff, Ms. Schultz's isolated and neutral email statement fails to suggests that she was doing anything other than informing the regional human resources director of a potential source of future litigation. Indeed, the Court of Appeals for the Third Circuit has held that having knowledge of protected status when making employment decisions allows employers to accurately determine whether their decisions comply with state and federal law.

Armbruster v. Unysis Corp., 32 F.3d 768, 781 (3d Cir. 1994) (overruled on other grounds Smith v. Wilkinsburg, 147 F.3d 272, 277 – 78 (3d Cir. 1998)).  There is simply nothing about Ms. Schultz's lone email which can be considered reasonably to imply discriminatory animus.  Cf. Kargbo v. Phila. Corp. for Aging, 16 F.Supp.3d 512, 523 – 25 (E.D. Pa. 2014) (Numerous statements by supervisor including, "I don't believe you are the right man for this job. You are 52 years old. This job is normally for young college graduates," constituted more than stray remarks.).  Therefore, inasmuch as Defendant seeks judgment as a matter of law with respect to Plaintiff's Title VII claim asserted at Count I of her Second Amended Complaint, the Court will grant the Motion for Summary Judgment.

Defendant next argues that Plaintiff failed to adduce evidence demonstrating either interference with, or retaliation for, the taking of FMLA leave for pregnancy or pregnancy-related health issues.  (Doc. 23 at 21–25).  The Court notes that the FMLA entitles an eligible employee to a maximum of twelve weeks of leave during a twelve month period due to the "birth of a son or daughter," or "a serious health condition that makes the employee unable to perform the functions of the position of such employee." Chapman v. UPMC Health Sys., 516 F.Supp.2d 506, 519 (W.D. Pa. 2007) (citing 29 U.S.C. § 2612(a)(1)(A–D)).  Claims for interference and discrimination/retaliation are available under the FMLA to employees who were improperly denied leave for the above reasons.  Hayduk v. City of Johnstown, 580 F.Supp.2d 429, 458 (W.D. Pa. 2008) (citing 29 U.S.C. § 2615(a); Callison v. City of Phila., 430 F.3d 117, 119 (3d Cir. 2005)).  However, the distinction between the two causes of action is important due to differing burdens of proof.  Hayduk, 580 F.Supp.2d at 458.  Liability for interference is not premised upon discriminatory intent, but solely upon the act of interference itself.  Mascioli v. Arby's Rest. Group, Inc., 610 F.Supp.2d 419, 430 (W.D. Pa. 2009) (citing Callison, 430 F.3d at

15

120). Retaliation under the FMLA is subject to McDonnell Douglas burden-shifting. Id. Plaintiff makes claims against Defendant for both interference and retaliation.

A claim for interference requires a showing that claimant "was entitled to benefits under the FMLA and that he was denied them." Chapman, 516 F.Supp.2d at 519. This includes evidence of "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." Id. at 520 (citing 29 C.F.R. § 825.220(b)). Therefore, to state a proper claim, a claimant must demonstrate that: (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA." Id. The evidence Plaintiff advances to support her claim for interference does not satisfy the fifth element, because there is no evidence that Defendant refused to authorize FMLA leave, manipulated Plaintiff's position to avoid applicability of the FMLA, or actively discouraged Plaintiff from taking leave. Callison, 430 F.3d 120.

To the extent Plaintiff may argue that her termination was an attempt to deny benefits under the fifth element, this Court notes that the Court of Appeals for the Third Circuit considers claims for wrongful termination under the FMLA to be discrimination/retaliation claims. Hayduk, 580 F.Supp.2d at 458 n. 18. "After termination, the employer cannot discourage the use of FMLA leave, because there is no longer an employment relationship or ability of the individual to take FMLA leave." Mascioli, 610 F.Supp.2d at 431–32. Thus, both of Plaintiff's FMLA claims are most appropriately classified as retaliation claims. See Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 301 (3d Cir. 2012) (finding that discharge of, or discrimination against, an employee for use or attempted use of FMLA leave is a retaliation

claim); see also Stephenson v. JLG Indus., Inc., 2011 WL 1304625 at *5 (M.D. Pa. Mar. 31, 2011) ("[C]ourts have consistently treated claims of interference as a result of termination as retaliation claims."). Plaintiff's cause of action for interference at Count II of her Second Amended Complaint will, therefore, be dismissed as moot.

As to whether Plaintiff adduced sufficient evidence of retaliation, the Court notes that a *prima facie* showing of retaliation in violation of the FMLA requires a plaintiff to demonstrate: "(1) he or she is protected under the FMLA, (2) he or she suffered an adverse employment decision, and (3) the adverse decision was causally related to plaintiff's exercise of his or her FMLA rights." Mascioli, 610 F.Supp.2d at 434 (citing Baltuskonis v. U.S. Airways, Inc., 60 F.Supp.2d 445, 448 (E.D. Pa. 1999)). While Plaintiff's evidentiary burden is a light one, here, the evidence must still illustrate that Defendant "*intentionally* discriminated against [Plaintiff] for exercising an FMLA right." Id. at 433. When viewed in the light most favorable to Plaintiff as the non-moving party, the first and second elements are clearly satisfied. However, Defendant argues that Plaintiff's ability to meet the third element is problematic.

For the same reasons discussed in regards to Plaintiff's *prima facie* showing pursuant to Title VII, the Court finds that Plaintiff has made out a *prima facie* showing of retaliation pursuant to the FMLA. Likewise, Plaintiff's failure to adduce sufficient evidence to demonstrate pretext vis-a-vis Defendant's well-grounded assertion of a legitimate, nondiscriminatory basis for termination, compels the Court to grant judgment as a matter of law with respect to Plaintiff's claim at Count III of her Second Amended Complaint.

## II. ORDER

For the reasons stated above, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment (**ECF No. 22**) is **GRANTED.**

December 11, 2015

                                                    <u>s/Cathy Bissoon</u>
                                                    Cathy Bissoon
                                                    United States District Judge

cc (via ECF email notification):

All counsel of record.